2026 IL App (1st) 242359

No. 1-24-2359

Opinion filed July 31, 2026

FIFTH DIVISION

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| TODD KOS, Individually and as Independent Administrator of the Estate of Patricia Kos, Deceased, | ) ) ) ) | Appeal from the Circuit Court of Cook County, Law Division. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 2020 L 013279 |
| v. | ) ) | |
| | ) | Honorable |
| EUGENE MUZYKANSKY, M.D., and ADULT PRIMARY CARE CENTER, LTD., | ) ) | Daniel A. Trevino, Judge, presiding. |
| | ) | |
| Defendants-Appellants. | ) | |

PRESIDING JUSTICE MITCHELL delivered the judgment of the court, with opinion.
Justice Mikva and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendants Eugene Muzykansky, M.D., and Adult Primary Care Center, Ltd., appeal the

medical malpractice judgment entered against them after a jury trial in the wrongful death and

survival action brought by plaintiff Todd Kos, individually and as independent administrator of

the Estate of Patricia Kos, deceased. At issue is (1) whether the circuit court erred in denying

judgment notwithstanding the verdict because plaintiff had a fatal gap in his *prima facie* case

establishing proximate cause; (2) whether the circuit court abused its discretion in denying

defendants' motion for a new trial because the jury's verdict was contrary to the manifest weight

of the evidence due to speculative causation testimony; and (3) whether the circuit court abused its discretion in denying defendants' motion for a new trial where defendants were prejudiced by the cumulative effect of various trial errors, specifically the admission of hearsay, unfounded criticisms of defendant's medical recordkeeping, improper cross-examination, and the display of graphic photographs to the jury. For the following reasons, we affirm.

¶ 2                                      I. BACKGROUND

¶ 3     Plaintiff Todd Kos, individually and as independent administrator of the Estate of Patricia Kos, deceased, filed this wrongful death and survival action against defendants Eugene Muzykansky, M.D., and Adult Primary Care Center, Ltd., following plaintiff's mother's death at age 67. Plaintiff alleged that defendants committed medical malpractice.

¶ 4     At the jury trial, plaintiff testified that in July 2015, his mother, Mrs. Kos, was at his house to watch his children. He knew she was not feeling well: she said she had stomach pains, and plaintiff knew she had bloody diarrhea. A few days later, plaintiff and Mrs. Kos spoke on the phone, and she told him she had just visited the doctor. She told plaintiff that the doctor prescribed hemorrhoid cream and told her to drink Imodium for the stomach pain. Plaintiff was relieved to hear it was only a hemorrhoid problem.

¶ 5     The next morning, plaintiff called Mrs. Kos to check on her. Mrs. Kos told plaintiff that she was feeling worse and that she was "puking blood." Plaintiff asked if she wanted him to take her to the doctor, and she said yes. Plaintiff left work and drove to her apartment. When plaintiff arrived, he called Mrs. Kos on the phone and told her to open the door for him. After waiting a few minutes, he called her again and she said she "was trying" to open the door. Eventually, a neighbor let plaintiff into the building, and plaintiff broke into his mother's apartment through the

back door. He saw trails of blood throughout the apartment, and photographs of these blood trails were admitted into evidence.

¶ 6       Plaintiff found his mother unresponsive on the toilet and called 911 for an ambulance. He was able to revive Mrs. Kos with chest compressions. Paramedics transported her to the hospital, but within the hour, emergency room staff told plaintiff that his mother had bled out and died. They told him they attempted blood transfusions, but it was too late. Plaintiff requested an autopsy be conducted to determine Mrs. Kos's cause of death. Once completed, the pathologist contacted plaintiff with the autopsy results and asked him for the contact information of Mrs. Kos's doctor, defendant Dr. Muzykanksy, stating he wanted him to sign the death certificate.

¶ 7       Defendant Dr. Muzykansky, a board-certified internal medicine physician, testified about his visits with Mrs. Kos before her death. Mrs. Kos first came to see defendant as a new patient on May 21, 2015. Defendant received her medical records from her prior physician a day before her visit, but defendant did not review them prior to the appointment. During the visit, Mrs. Kos explained she was switching from a new doctor and wanted defendant to manage her diabetes. She provided defendant with a list of her current medications, which included a blood thinner (anticoagulant), and spoke about her medical history. Defendant checked her vitals: she was 226 pounds, her blood pressure was 100/70, and her heart rate was 73. Defendant did not order blood work. Mrs. Kos had no complaints, so defendant told her to return in three months for tests and diabetes management.

¶ 8       Two months later, however, on July 16, 2015, Mrs. Kos returned for an unscheduled visit. She complained of four days of diarrhea that was improving and a couple drops of bright red blood in the toilet. Defendant noted Mrs. Kos had lost twelve pounds since the previous visit. Mrs. Kos

reported she lost it gradually due to poor appetite. Defendant took two blood pressure measurements, the first being 85/50 and the second being 90/50. Since defendant had not looked at Mrs. Kos's previous medical records, he did not know whether she ever had blood pressure at these levels. Mrs. Kos's heart rate was 85 and her hemoglobin, the part of red blood cells that carries oxygen, was 14.6. Mrs. Kos's hemoglobin was within the normal range for an adult, but defendant did not know 14.6 was below Mrs. Kos's baseline since he had not read her medical records.

¶ 9 Defendant further testified that Mrs. Kos did not complain of chest pain or abdominal pain and had no rebound tenderness in her abdomen. Defendant performed a rectal exam and identified a small anal fissure, a papercut-like small imperfection. Defendant also performed a Hemosure test, which tests for invisible blood in the stool, and the results were negative. In addition to the anal fissure, defendant concluded Mrs. Kos had colitis, enteritis, and gastroenteritis of presumed infectious origin as well as hypotension. Defendant's plan was to let Mrs. Kos's gastroenteritis and diarrhea run its course, treat the anal fissure with cream, have Mrs. Kos stop her blood pressure medications, and have her return in four days for another evaluation. Based on this visit, defendant did not believe the standard of care required him to send Mrs. Kos to the emergency room.

¶ 10 Several witnesses explained that the next day, on July 17, 2015, Mrs. Kos died from a gastrointestinal hemorrhage caused by an undiagnosed duodenal ulcer that formed due to cancer. Plaintiff's internal medicine expert, Dr. Morris Papernik, explained that a duodenal ulcer is an erosion of the lining of the duodenum, the first portion of the small intestine, which forms a crater. An ulcer can cause a small bleed as it slowly erodes through the layers of the stomach and gets to the major blood vessels. Dr. Papernik evaluated Mrs. Kos's medical records and autopsy and

explained that Mrs. Kos hemorrhaged when "it totally opened up all the way and everything started gushing out."

¶ 11    Dr. Papernik further testified that Mrs. Kos's hemoglobin with her previous physician was 17.0, and the drop to 14.6 on the day of her acute visit with defendant was a sign Mrs. Kos likely had a slow bleed going on for months. Dr. Papernik explained that a reasonably careful internal medicine doctor should have been concerned about Mrs. Kos's weight loss and blood pressure changes between the two visits with defendant. He opined that defendant did not ask Mrs. Kos enough questions, specifically about the blood in the toilet. He explained that a Hemosure test does not rule out the possibility that bleeding is coming from higher up in the GI system. Dr. Papernik also critiqued defendant's failure to record the results of an orthostatic blood pressure check in Mrs. Kos's chart. Ultimately, Dr. Papernik concluded that Mrs. Kos needed to be seen urgently at the hospital, and defendant deviated from the standard of care by not recognizing this. Further, he stated Mrs. Kos would have survived if her duodenal ulcer and cancer were diagnosed as of July 16, 2015. He stated that effective means would have been undertaken to prevent the massive hemorrhage and stabilize Mrs. Kos for surgery to remove her cancer.

¶ 12    Plaintiff also presented testimony from Dr. Joshua Ellenhorn, a general surgery and surgical oncologist expert. He explained that if a patient begins to have intestinal bleeding "in a hospital setting," "a variety of measures can be implemented." He described how a patient could be given blood products, an emergency endoscopy, or an emergency operation. Additionally, Dr. Ellenhorn testified that a duodenal ulcer is diagnosed with an endoscopy, which is done by gastroenterologists for diagnostic purposes. A gastroenterologist would take a biopsy of the ulcer to determine whether it is cancerous. Based on Mrs. Kos's medical records and autopsy, Dr.

Ellenhorn opined that Mrs. Kos's cancer was probably at Stage 2B. He testified that if Mrs. Kos were deemed medically fit to undergo surgery, her cancer could have been operated on and resected (removed). Dr. Ellenhorn stated that more likely than not, it could have been treated successfully. He stated that the survival rate for duodenal cancer without metastases that is resected is just above 50% for five years.

¶ 13    Defendants' own internal medicine expert, Dr. Michael McDonnell, testified in part that defendant complied with the standard of care because there was nothing to lead a reasonably careful internal medicine doctor to consider a potential upper GI duodenal ulcer bleed given Mrs. Kos's symptoms. He also testified that even if Mrs. Kos was sent to the hospital, she was a high-risk surgical patient.

¶ 14    Dr. Michael Kaufman, defendants' pathology expert, opined that based on his review of the autopsy, Mrs. Kos had Stage 4 cancer due to metastases to the liver. Dr. Mitchell Posner, defendants' surgical oncologist expert, testified that Stage 4 cancer could not be viably treated by surgery. During cross-examination, plaintiff questioned Dr. Posner about his pretrial disclosure obligations and the governing rules. After defendants' objections to this questioning were overruled, defendants moved for a mistrial, and the circuit court denied the motion.

¶ 15    The jury returned a verdict in favor of plaintiff. Defendants moved for judgment notwithstanding the verdict or, alternatively, a new trial. The circuit court denied the motions and entered judgment on the verdict. This timely appeal followed. Ill. S. Ct. R. 303 (eff. July 1, 2017).

¶ 16                                    II. ANALYSIS

¶ 17            A. Proximate Cause: Judgment Notwithstanding the Verdict or New Trial

¶ 18    Defendants argue the circuit court erred in denying their motion for judgment notwithstanding the verdict where plaintiff failed to establish a *prima facie* case of medical malpractice, specifically proximate cause. Defendants argue that plaintiff's evidence left a fatal gap between defendant's actions and Mrs. Kos's death because there was no expert testimony as to what a reasonable emergency medicine physician or gastroenterologist would have done to help prevent her death before a surgical oncologist was involved. Plaintiff argues testimony from an emergency medicine physician was not required where plaintiff's surgical-oncologist expert testified about how Mrs. Kos's bleed would have been treated in the hospital. Further, plaintiff argues that testimony from a gastroenterologist was not required to establish a *prima facie* case because a gastroenterologist would have merely provided an emergent diagnostic tool whereas a surgical oncologist would have provided the proper treatment. Judgment notwithstanding the verdict "is appropriate where all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Walton v. Dirkes*, 388 Ill. App. 3d 58, 60 (2009). We review the denial of a motion for judgment notwithstanding the verdict *de novo*. *Taylor v. City of Chicago*, 2024 IL App (1st) 221232, ¶ 55.

¶ 19    "A plaintiff in a medical malpractice case must prove: (1) the standard of care against which the medical professional's conduct must be measured; (2) the defendant's negligent failure to comply with that standard; and (3) the defendant's negligence proximately caused the injuries for which the plaintiff seeks redress." (Internal quotation marks omitted.) *Walton*, 388 Ill. App. 3d

at 60. In a "lost chance" case, a plaintiff must show that the defendant's malpractice proximately caused the lost chance of recovery or survival. See *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 119 (1997). Proximate cause must be established by expert testimony to a reasonable degree of medical certainty. *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 32.

¶ 20    The parties agree that Mrs. Kos's immediate cause of death was a hemorrhage, which occurred because of a duodenal ulcer that formed due to cancer. At trial, plaintiff's internal medicine expert, Dr. Papernik, testified that when Mrs. Kos visited defendant, she was clearly bleeding, and defendant breached the standard of care by failing to recognize that Mrs. Kos needed to be sent to the hospital for emergency evaluation and treatment:

> "My opinion is that he failed to recognize the fact that patient had lost weight, had a significant drop in her hemoglobin. He failed to recognize that the Hemosure test was not ruling out an upper GI bleed. He failed to send her to the emergency room to get an emergency evaluation of why her blood pressure was so low, why she lost weight, and why her blood count had dropped.
> ***
> In summary, it was, obvious[ ] that she was bleeding. She was losing weight. She had a process that was not fully explained on the exam that needed to be evaluated either that day or sometime sooner than that."

¶ 21    Plaintiff's other expert, general surgeon and surgical oncologist Dr. Ellenhorn, explained how Mrs. Kos's bleed would have been treated if she were sent to the hospital. Dr. Ellenhorn testified that a patient like Mrs. Kos would first be given blood products, including products designed to counteract the anti-clotting effects of blood thinners:

> "So two things happen when a patient in a hospital is seen to have bleeding. Number one, we check the blood count and give blood products as needed ***.
>
> Also, the other thing we would do in terms of blood products is if the patient has been on anticoagulation, we can give them blood products that would correct the blood-clotting deficiency, that's the result of those medications, and that, in addition to the other two, will help stop bleeding.

\*\*\*

[O]ne of the primary problems when you're bleeding is that your blood count drops, and your body's—the heart can't pump enough oxygen-containing cells out to the body's tissues, and we supplement that by giving blood products, particularly red blood cell transfusions in addition to other types of transfusions to improve the body's clotting mechanism."

Next, the patient would have some sort of emergency procedure or an emergency operation to directly address the area that is bleeding:

"The patient could have an emergency endoscopy, and sometimes with the help of the endoscopy, the bleeding can be controlled by clipping or controlling the bleeding vessel, or the patient can go down to the radiology department, and they can access the blood vessel that's bleeding and put some material in it that would clot it off.
\*\*\*
Operating and stopping the bleeding is always possible, and usually it's not that difficult an operation. We're not doing a big resection. We're just going in and putting—opening up, putting some stitches in to temporize the issue."

¶ 22 Dr. Ellenhorn concluded that if Mrs. Kos were sent to the hospital, the immediate massive bleed that "caused the death either would not have occurred or would have been temporized \*\*\*, and then that would have allowed a more elective evaluation and treatment of the cancer."

¶ 23 As to the cancer, Dr. Ellenhorn explained how an endoscopy would show an ulcer, and a biopsy would determine whether the ulcer was cancerous. Dr. Ellenhorn opined that Mrs. Kos's cancer could have been treated surgically with either a gastric resection or pancreatic head resection. Overall, he concluded that Mrs. Kos would have survived both the bleed and the cancer if she had been sent to the hospital.

¶ 24 In sum, Dr. Papernik testified that defendant should have realized Mrs. Kos was bleeding and sent her to the hospital. Had he done so, Dr. Ellenhorn testified how her bleed would have been stopped, preventing her immediate cause of death. See *Walton*, 388 Ill. App. 3d at 68 ("The strongest evidence of proximate cause in this case is [the expert doctor's] testimony regarding how

[the decedent] would have been treated had defendant ordered a CBC during [the decedent's] May 3 office visit."). He further explained how Mrs. Kos's cancer would have been diagnosed and treated successfully. Through this expert testimony, plaintiff sufficiently presented a causal link between defendant's failure to send Mrs. Kos to the hospital and her lost chance of survival. Contrary to defendants' suggestion, plaintiff did not fail to establish a *prima facie* case on proximate cause.

¶ 25    Defendants raise several arguments about plaintiff's failure to present expert testimony from a gastroenterologist, including that the absence of such testimony left a fatal gap in plaintiff's case. Plaintiff's expert Dr. Papernik, however, described various ways he believed defendant deviated from the standard of care. One way was defendant's failure to refer Mrs. Kos to a gastroenterologist, but another was defendant's failure to send Mrs. Kos to the hospital for urgent treatment. Because we determined plaintiff presented a sufficient *prima facie* case concerning defendant's failure to send Mrs. Kos to the hospital, we need not consider the referral to a gastroenterologist as an alternate basis for liability. See *Grillo v. Yeager Construction*, 387 Ill. App. 3d 577, 595 (2008) (stating this court may affirm a judgment on any basis in the record).

¶ 26    Defendants argue that even under the theory that defendant was negligent for failing to send Mrs. Kos to the hospital, plaintiff's causation evidence was speculative without testimony from a gastroenterologist. See *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 413 (2000) ("The causal connection must not be contingent, speculative, or merely possible."). Defendants rely heavily on Dr. Ellenhorn's testimony that a gastroenterologist is typically the type of doctor who would perform an endoscopy to diagnose an ulcer. But as defendants argue, "the dispositive causal issue" was the "immediate cause of Mrs. Kos death," which was "not her

underlying cancer but a fatal gastrointestinal hemorrhage." Dr. Ellenhorn testified at length as to how the bleed would have been treated and did not suggest a gastroenterologist would provide that treatment or that he would defer to a gastroenterologist. Even so, an expert need not be licensed in the same field of medicine that he testifies about when addressing causation and injury issues. *Davis v. Kraff*, 405 Ill. App. 3d 20, 38 (2010). The circuit court overruled defendants' objection to Dr. Ellenhorn's testimony about how the bleed would have been managed, and defendants do not contend the circuit court abused its discretion in allowing this testimony.

¶ 27 Defendants argue this case is comparable to *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967 (1997). There, the court held there was "a gap in the evidence of proximate cause fatal to plaintiff's case" where no neurosurgeon testified that neurosurgery should have occurred absent the defendant's negligence. *Id.* at 975. However, that lack of testimony was dispositive in *Aguilera* because both of plaintiff's experts explicitly testified that they would have deferred to or consulted a neurosurgeon to decide whether surgical intervention was appropriate. *Id.* at 974-75. The experts "did not know what a neurosurgeon would have done" to treat the patient. *Id.* at 969-70. Here, however, Dr. Ellenhorn testified to how the bleed would have been treated. See *Jefferson*, 2018 IL App (1st) 162219, ¶ 35 ("Because [the expert doctor] testified to the specific interventions that, if undertaken earlier, would have prevented [the patient's] injury, this case is not comparable to those where experts failed to identify the treatment that should have been performed to prevent the plaintiffs' injuries.").

¶ 28 Lastly, defendants argue that there was no indication that Mrs. Kos would have received an immediate assessment or timely treatment if defendant had sent her to the hospital. However, Dr. Papernik testified that Mrs. Kos needed to be seen in the hospital urgently for her bleed, and

Dr. Ellenhorn testified that measures can be implemented "very quickly" to stop a bleed, including an emergency operation. From this testimony, it is a reasonable inference that, had defendant sent Mrs. Kos to be treated urgently for her bleed, she would have received timely treatment, or at the very least treatment before her death the next morning. *Wilcox v. Advocate Condell Medical Center*, 2024 IL App (1st) 230355, ¶ 86 ("As with all issues on a motion for judgment notwithstanding the verdict, we evaluate the evidence and inferences to be reasonably drawn from it on the issue of proximate cause in the light most favorable to the plaintiff."). Thus, the circuit court did not err in denying defendants' motion for judgment notwithstanding the verdict.

¶ 29 Alternatively, defendants argue that the circuit court abused its discretion in denying defendants' motion for a new trial because plaintiff's causation gap rendered the verdict contrary to the manifest weight of the evidence. See *Jefferson*, 2018 IL App (1st) 162219, ¶ 37 ("We review a circuit court's decision with respect to a motion for a new trial for an abuse of discretion."). "A motion for a new trial should be granted only where the jury's verdict is contrary to the manifest weight of the evidence. [Citation.] A verdict is contrary to the manifest weight of the evidence where the opposite conclusion is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based upon any of the evidence." *Id.* "We have already determined that plaintiff's case did not suffer from a 'causation gap,' and therefore, the evidence on causation necessarily meets the less exacting standard to withstand a motion for a new trial." *Id.* ¶ 38. Thus, the circuit court did not abuse its discretion.

¶ 30                                    B. Trial Errors

¶ 31 Defendants argue that the circuit court abused its discretion in denying defendants' motion for a new trial because various trial errors, individually and cumulatively, led to undue prejudice

against defendants and compromised their right to a fair trial. Specifically, defendants argue the circuit court erred by (1) admitting hearsay statements from Mrs. Kos and the doctor who conducted her autopsy, (2) allowing criticism of defendant's medical recordkeeping, (3) permitting plaintiff to exceed the bounds of proper cross-examination, and (4) admitting graphic photographs of Mrs. Kos's apartment. Plaintiff argues that the circuit court properly denied defendants' motion for a new trial because there were no trial errors and any purported prejudice was minimal. We review the denial of a motion for a new trial for an abuse of discretion. *Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992). To determine abuse of discretion, we consider whether the verdict was supported by the evidence and whether defendants were denied a fair trial. *Id.*

¶ 32                                    1. *Hearsay*

¶ 33    Defendants argue it was prejudicial error for the circuit court to admit plaintiff's hearsay testimony that (a) his mom complained of stomach pain before her death and (b) the pathologist told plaintiff he wanted defendant to sign the death certificate. Defendants argue plaintiff improperly used this testimony to establish that Mrs. Kos had stomach pain, to insinuate defendant falsified medical records, and to imply that the pathologist suspected defendant of wrongdoing. Plaintiff argues the testimony was not hearsay because it was offered for the effect on plaintiff, the listener, and not for the truth of the matter asserted. Plaintiff also argues that any potential prejudice from the testimony was cured by the circuit court's limiting instructions. Evidentiary rulings are generally reviewed for an abuse of discretion. *People v. Trutenko*, 2024 IL App (1st) 232333, ¶ 126. However, our review of whether a statement constitutes hearsay is *de novo*. *Id.*

¶ 34    "Hearsay evidence is testimony in court or written evidence, of a statement made out of court, *** being offered as an assertion to show the truth of matters asserted therein ***." (Internal

quotation marks omitted.) *People v. Carpenter*, 28 Ill. 2d 116, 121 (1963). Hearsay statements are inadmissible. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 99 (1995). However, "[s]tatements offered not for the truth of the matter asserted, but rather for another purpose, are not hearsay." *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 675 (1992). "The distinction between admissible testimony and inadmissible hearsay is illustrated by the example of the witness A testifying that 'B told me that event X occurred.' If A's testimony is offered for the purpose of establishing that B said this, it is clearly admissible—if offered to prove that event X occurred, it is clearly inadmissible." (Internal quotation marks omitted.) *Leonardi*, 168 Ill. 2d at 99.

¶ 35                                    a. Complaints of Stomach Pain

¶ 36    At trial, plaintiff testified that before visiting defendant, his mother complained to him of stomach pain. Defendants objected to this testimony based on hearsay, and the circuit court overruled the objections:

> "Q. And how was she doing on that Monday?
> A. She was not feeling well. She was not feeling well at all.
> Q. She had stomach pains, and she said she—
> [DEFENDANTS' ATTORNEY]: Objection to hearsay.
> THE COURT: It's overruled.
> A.  She said she had stomach pains and—
> [DEFENDANTS' ATTORNEY]: Objection: hearsay.
> THE COURT: So that is overruled. Ladies and gentlemen of the jury, you heard evidence of a statement by the plaintiff's mother. You are not to consider the statement for the truth, but only as to the issue of it having been made to the witness. That's it.
> Q. So what was your understanding? You said she wasn't feeling well. Tell us, what did you understand the issues to be?
> A. She had stomach pains, and she had—she had bloody diarrhea."

¶ 37    As the circuit court explained in its limiting instruction to the jury, plaintiff's testimony was admitted only to show that his mother made a statement to him, complaining of stomach pain. Regardless of whether plaintiff's testimony should have been offered for this purpose, the circuit

court's limiting instruction explicitly told the jury not to use the statement for its truth. Thus, the circuit court mitigated the prejudice against defendants. See *People v. Sims*, 2019 IL App (3d) 170417, ¶ 33 (explaining that a circuit court's instructions to the jury to consider evidence for a limited purpose reduces the prejudicial effect); *People v. Boston*, 2018 IL App (1st) 140369, ¶ 75 (the jury is presumed to follow the circuit court's limiting instructions). In fact, when the circuit court ruled on defendants' post-trial motion and again considered the issue after observing all the evidence, it concluded that defendants were not prejudiced:

> "The defendants in their brief had on at least one occasion outlined the court's limiting instruction, specifically telling the court that it shall not be considered for its truth. The court was very direct and the report of proceedings will reflect that.
> ***
> In other words, we all know what goes into a trial. Ultimately under a motion for new trial the parties are entitled to a trial free of substantial prejudice and a new trial should be granted only when the verdict is contrary to the manifest weight of the evidence when the opposite conclusion is clearly evident [or] when the jury's finding proves to be unreasonable, arbitrary, not based on any of the evidence. ***.
>
> This court cannot make the finding that the jury's verdict in this case was unreasonable arbitrary and not based on any of the evidence based on the arguments put forth in defendant's post-trial motion."

In light of the circuit court's instruction to the jury *not* to consider the statement for its truth, defendants cannot establish prejudice.

¶ 38    Defendants also challenge plaintiff's testimony about a phone conversation with his mother after her doctor's visit where defendants' hearsay objections were again overruled:

> "Q. And what was your understanding of what was going on with her on Thursday?
> A. She told me she had just—
> [DEFENDANTS' ATTORNEY]: Objection: hearsay.
> THE COURT: So there's an objection. The witness hasn't said yet what his decedent told him. The objection is overruled. The jury, you are only to consider the statement that the decedent gave to the witness, not for its truth, but only as to the fact that it was made to the witness. That's it.
> ***

A. She called me on that day. And she told me she just got back from the doctor's office, and he prescribed a hemorrhoid cream and told her to drink Imodium for the stomach pain. So she was at the Walgreens, I believe it was, when she was filling the prescription and getting the Imodium. And then she said she was going to go home and rest. That's what she told me."

Plaintiff used this testimony in relevant part to explain why he did not perceive his mother to have a serious medical issue:

"Q. Okay. And what was your understanding as to what was going on with your mother on the 17th?
A. I was relieved that it was only a hemorrhoid problem. I was very relieved about that."

In fact, on cross-examination, defendants questioned plaintiff extensively about his failure to advise his mother to seek medical care leading up to her death and his delayed arrival to assist her after he knew she was vomiting blood:

"Q. Okay. And you came to understand that she had some conditions of ill-being, correct?
A. Correct.
Q. When you heard that from your mother, did you advise her that she should make a medical appointment?
A. No, I didn't. You know, my—
Q. Okay. When you heard that, did you advise your mother that she ought to go to immediate care and get checked out?
A. No, I didn't.
                                        ***
Q. All right. And then after talking to your mother and hearing her—or coming to understand that she had these serious medical problems, you drove from 2600 South up to 3600 North to the police station at 850 West Addison. That's three blocks east of Wrigley Field, correct?
A. Correct.
                                        ***
Q. And then from 3600 North Addison, you drove to 4000 South Talman, where your mother lived?
A. Correct.
Q. And I think you testified that from the time of the phone call at 8:00 o'clock until getting to your mother's house took, your estimate was, 60 to 90 minutes, right?
A. I believe so, yes.

Q. Prior to leaving \*\*\*, did you call the fire department for paramedic service for your mother?
A. No, I did not.

\*\*\*

Q. Okay. So what you came to understand at 8:00 o'clock in the morning on July 17, you didn't ask for ambulance service until an hour and 58 minutes later according to the records; is that correct?
A. Yes. \*\*\*."

¶ 39    Plaintiff testified as to what his mother told him after her doctor's visit, not to prove the truth of what happened during the visit, but rather to show the effect of this information on him, the listener. Plaintiff's state of mind was relevant to explain his behavior leading up to Mrs. Kos's death and was not hearsay. See *Abraham v. Advocate Health & Hospitals Corporation*, 2025 IL App (1st) 241351-U, ¶ 149 (explaining an out-of-court statement was not hearsay when offered to prove the listener's state of mind and "why the plaintiffs waited until August 19, 2013, to take their son to the hospital"). Thus, it was not an abuse of discretion to admit it. See *Fakes v. Eloy*, 2014 IL App (4th) 121100, ¶ 129 (concluding it was well within the circuit court's discretion to admit testimony of an ICU nurse's "characterization of decedent's condition for the limited purpose of its effect on" the listener).

¶ 40    Defendants argue that plaintiff impermissibly used this "hearsay" testimony about Mrs. Kos's complaints of stomach pain while questioning other witnesses to contradict defendant's testimony that Mrs. Kos did not complain of stomach pain during her visit with defendant:

"Q. Okay. And so you understand that Mr. Kos stated that his mother told him she had stomach pain, right? You heard him say that?
A. Yeah, I heard him say that.
Q. And that is not in your records, right?
A. She didn't report it to me."

Plaintiff also asked Dr. McDonnell, defendants' internal medicine expert, about plaintiff's testimony:

"Q. Todd is claiming that his mother did make complaints of stomach pain on Monday in their house and when he talked to her from the pharmacy parking lot on the 16th. Did you see that?
A. Correct.
Q. He said she picked up Imodium as well for that?
A. Correct.

***

Q. Did you see that Todd testified that his mother said that Dr. Muzykansky told her to also pick up Imodium for the stomach pain?
A. Correct.
[DEFENDANTS' ATTORNEY]: Objection: hearsay.
THE COURT: That's overruled.
A. Correct.
Q. Okay. So we do agree there's some—there's some disagreement whether Patricia Kos was making complaints of stomach pain on that day, true?
A. Which day?
Q. The 16th.
A. True.

***

Q. You are not able to tell the ladies and gentlemen of the jury who is telling the truth between Dr. Muzykansky and Todd Kos, whether Patricia was complaining of stomach pain, true?
A. I know neither of them, so I could not."

¶ 41    In both instances, plaintiff's subsequent use of his testimony about Mrs. Kos's complaints of stomach pain was not hearsay. Hearsay testimony aims to prove the truth of an out of court statement and thus depends "upon the credibility of the out-of-court asserter." *Carpenter*, 28 Ill. 2d at 121. Here, the value of plaintiff and defendant's testimony about what statements were made to them depends on their own credibility, not on the credibility of Mrs. Kos and the truth of her statements. See *Tomaszewksi v. Godbole*, 174 Ill. App. 3d 629, 636 (1988) (concluding testimony was not hearsay where its value "rested upon the credibility of the defendant and whether or not the jury believed that the defendant had the conversation in the first place").

¶ 42    Lastly, defendants argue that plaintiff used this "hearsay" testimony to insinuate that defendant intentionally altered or falsified his medical records as a cover-up. Defendants point to plaintiff's questions about when defendant finalized his medical records:

> "Q. Doctor, you electronically assigned and finalized and approved the record on August 25th, 2015, at 2:50 p.m., true?
> A. True.
> Q. And that is a month and eight days after she died?
> A. True.
> Q. Okay. And you had the autopsy by this point?
> A. Preliminary result.
> Q. You had the preliminary autopsy report at this time?
> A. I think so, yes."

We reject defendants' interpretation of this brief questioning as insinuating defendant intentionally changed or falsified his records. This questioning was preceded by defendant's testimony about his independent memory and that his records are the best evidence concerning his visit with Mrs. Kos. Plaintiff's testimony and this subsequent use was not hearsay, so the circuit court did not abuse its discretion in admitting it.

¶ 43                                    b. Death Certificate

¶ 44    Defendants also argue the circuit court erred by admitting hearsay when plaintiff testified about his conversation with Dr. Harper, who conducted the autopsy. Plaintiff testified that Dr. Harper called him to ask for defendant's contact information and said he wanted defendant to sign the death certificate:

> "Q. Okay. And what understanding did you gain from Dr. Harper?
> [DEFENDANTS' ATTORNEY]: Same objection, your Honor.
> THE COURT: That's overruled. The jury shall consider only the mere making of the statement, not the truth of the contents of the statement.
>                                    ***
> Q. Okay. And did you gain any other understanding from Dr. Harper?
> A. Yes. He was—He asked me for contact information for Dr. Muzykanksy.
> Q. Okay. And did he tell you why he wanted that contact information?

A. Yes.

Q. Why?

A. He told me that he's performed countless autopsies over the years and signed an—you know, countless death certificates, but he wanted Dr. Muzykansky to sign that death certificate.

Q. And he didn't explain any further?

A. No.

Q. Okay. And did you gain any other understanding from Dr. Harper?

A. No. That was all."

¶ 45     This brief line of questioning was part of plaintiff's larger understanding of the events that unfolded after his mother's death. Plaintiff described his request for the autopsy, his phone call with defendant who said he wished to be contacted with the autopsy results, and plaintiff's conversation with Dr. Harper about the results of the autopsy. The circuit court permitted plaintiff's testimony about what Dr. Harper told him for the limited purpose of Dr. Harper making the statement, as part of plaintiff's account of events, and not for the truth of the matter asserted. See *Boston*, 2018 IL App (1st) 140369, ¶ 75 (explaining that jurors are presumed to follow the circuit court's limiting instructions).

¶ 46                                  2. *Critique of Medical Records*

¶ 47     Defendants next argue that the circuit court abused its discretion by permitting Dr. Papernik to criticize defendant's documentation in Mrs. Kos's medical records without any expert testimony providing a causal link between this alleged deviation from the standard of care and Mrs. Kos's death. Plaintiff argues the testimony at issue related to what a reasonably careful internal medicine physician needed to know for a differential diagnosis and was essential to prove defendant was negligent in failing to obtain a full examination and work up on Mrs. Kos's complaints, signs, and symptoms. We review the circuit court's evidentiary rulings for abuse of discretion. *Davis*, 405 Ill. App. 3d at 28.

¶ 48 When expert testimony on the defendant's breach of the standard of care is not accompanied by testimony showing the deviation proximately caused the injury, it is irrelevant and properly excluded. *Guski v. Raja*, 409 Ill. App. 3d 686, 701-02 (2011); *Robinson v. Alexander*, 2021 IL App (2d) 200462-U, ¶ 103; see Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011) (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

¶ 49 Before trial, defendants filed a motion *in limine* seeking to bar Dr. Papernik from opining that defendant deviated from the standard of care without a causal nexus to the claimed injuries. Relevant here, defendants sought to bar Dr. Papernik's testimony regarding defendant's failure to record certain information in Mrs. Kos's chart. The circuit court denied the motion, concluding that plaintiff's allegations of defendant's failure to work up Mrs. Kos's symptoms and complaints were enough for proximate cause at this stage but defendants could object to questioning at trial. See *Pyskaty v. Oyama*, 266 Ill. App. 3d 801, 819 (1994) ("[T]he circuit court has discretion to grant the motion and to enter an order before trial excluding the evidence, or to deny the motion and to leave to the moving party the procedure of objecting to the evidence when it is offered at trial.").

¶ 50 At trial, Dr. Papernik testified that defendant's omission of the numeric results of his orthostatic blood pressure check was a deviation from the standard of care, and defendants objected but were overruled:

> "Q. Drawing your attention to Plaintiff's Exhibit 3, the 7/16 of '15 visit and we're in the 'Vitals' category. The next sentence says, 'No significant orthostatic changes to pulse or blood pressure.'
> Tell the jury what an orthostatic change is.

"A. So we do what we call orthostatic blood pressures and pulses to see if a person is hypovolemic, meaning a decrease in volume in their bloodstream.

***

So the typical way that we do these orthostatic blood pressure checks is patient is lying down for a few minutes, they are comfortable, and then we check the blood pressure and their pulse when they are lying down. And then we have them stand up, and we check the blood pressure and their pulse when they stand up, looking for a blood pressure drop and a pulse that will go up.

Q. Now, when you see the sentence, as a reasonably careful internist, 'no significant orthostatic changes,' do you take that to mean there were no changes?

A. No. There were changes. Wasn't deemed to be significant.

Q. Do you see any numbers as to what those orthostatic changes were?

A. So the standard of care is if you are going to do an orthostatic blood pressure and pulse checks, you've got to document, one, that you did it.

[DEFENDANTS' ATTORNEY]: Objection, 213.

THE COURT: Just one moment.

That's overruled.

A. And then, number two, you have to actually put the numbers down. You put the blood pressure, what was it when she was lying down and what was it when she was standing up, both the blood pressure and the pulse. So the reader can actually make a decision based on what the numbers were, whether it is significant or not.

[DEFENDANTS' ATTORNEY]: Objection, 213. Motion in Limine 15.

***

THE COURT: It's overruled. ***.

***

Q. Doctor, there are no pulse numbers as well as no blood pressure numbers for the orthostatic changes; is that correct?

A. Correct."

¶ 51    Dr. Papernik testified that defendant breached the standard of care by not recording the numeric results, but plaintiff did not provide any testimony as to how this breach caused any injuries. There was no testimony that anyone read or relied on the chart. See *Smith v. Krolik*, 2011 IL App (1st) 101132-U, ¶ 49 (allowing testimony that defendant's failure to chart was a deviation from the standard of care where the plaintiff presented testimony "that subsequent dentists relied on the information in her medical records to create a comprehensive treatment plan"). Without any testimony as to how defendant's failure to record the specific numeric results in the chart contributed to Mrs. Kos's injury, the testimony was irrelevant and should have been excluded. See

*Lasalle National Trust, N.A. v. Swedish Covenant Hospital*, 273 Ill. App. 3d 780, 792 (1995) (holding the circuit court correctly excluded evidence where there was no evidence that doctor's failure to chart caused any of the claimed injuries).

¶ 52     Plaintiff argues that Dr. Papernik's testimony is relevant to defendant's failure to gather the necessary information for a differential diagnosis and his failure to work up Mrs. Kos's complaints and symptoms. But according to both defendant and Dr. Papernik's testimony, defendant did gather that information: he checked Mrs. Kos's orthostatic pulse and blood pressure and determined the results to be insignificant. Plaintiff did not provide testimony to explain why the failure to record the specific numbers was relevant.

¶ 53     Even so, this testimony was not so prejudicial as to deprive defendants of a fair trial. Defendants argue that this testimony left the jury with the idea that defendant could not be trusted. That implication, however, does not arise from this testimony. Dr. Papernik's testimony, based on his reading of the medical records, corroborated defendant's testimony that defendant indeed performed the test and evaluated the results. Moreover, neither the orthostatic tests nor defendant's failure to record the results in Mrs. Kos's chart were among the enumerated list provided to the jury of ways to find defendants negligent, so presumably the jury did not rely on this testimony in reaching its verdict.

¶ 54                                3. *Cross-Examination*

¶ 55     Defendants next argue the circuit court abused its discretion in permitting plaintiff to exceed the permissible scope of cross-examination by questioning defense witnesses about pretrial disclosure rules and obligations. For the same reason, defendants also argue it was error for the circuit court to deny their motion for a mistrial based on plaintiff's questioning of Dr. Posner.

Plaintiff argues that several of defendants' contentions are forfeited where they did not object to the questioning at trial. Plaintiff also argues that the questioning was not prejudicial because defendants had several opportunities to cure any perceived prejudice and, contrary to defendants' assertion, plaintiff did not insinuate defendants were covering up evidence. We review the scope and extent of cross-examination and the denial of a motion for a mistrial for an abuse of discretion. *Adams v. Sarah Bush Lincoln Health Center*, 369 Ill. App. 3d 988, 998 (2007); *Arkebauer v. Springfield Clinic*, 2021 IL App (4th) 190697, ¶ 75.

¶ 56    "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness, which include matters within the knowledge of the witness that explain, qualify, discredit or destroy the witness's direct testimony." Ill. R. Evid. 611(b) (eff. Oct. 15, 2015). Evidence of a witness's prior inconsistent statement is admissible to impeach the credibility of a witness. *Oldham v. Kubinski*, 37 Ill. App. 2d 65, 78 (1962). Discovery depositions and answers to interrogatories may be used to impeach the testimony of a witness "in the same manner and to the same extent as any inconsistent statement made by a witness." Ill. S. Ct. R. 212(a)(1) (eff. Oct. 1, 2020); R. 213(h) (eff. Jan 1, 2018); see *York v. El-Ganzouri*, 353 Ill. App. 3d 1, 18-19 (2004).

¶ 57                              a. Cross-Examination of Defendant

¶ 58    Defendants first challenge plaintiff's cross-examination of defendant Dr. Muzykansky, arguing he was impermissibly questioned about the purpose and legal implications of discovery depositions and disclosures under Illinois Supreme Court Rule 213. On direct examination, defendant testified that Mrs. Kos initially came to him to manage her diabetes. On cross-

examination, plaintiff attempted to impeach defendant on the basis that he did not mention this in his deposition:

> "Q. Okay. Doctor, you also never said before today that you had a memory that Patricia Kos only wanted to talk to you about managing her diabetes, and that's the main reason she wanted to see you. You never said that before today, true?
> A. I think I said it in my deposition.
> Q. Do you?
> A. I—I'm not hundred percent sure, but I think I said it in my deposition."

After plaintiff refreshed defendant's recollection with particular pages of his deposition, defendant agreed that assertion was absent:

> "Q. Okay. If I could just get a question out. I just wanted to confirm first that you read it?
> A. Yes.
> Q. And that's where we are discussing your independent recollection?
> A. Yes.
> Q. And you didn't say anything about the only reason Patricia Kos came to see you was to manage her diabetes? True?
> A. True."

Defendant restored his credibility on redirect examination by clarifying that his deposition was consistent with his testimony in court:

> "Q. Here: Dr. Muzykansky, would you please refer to page 112, lines 13 through 20, and just read it to yourself.
> A. Yes.
> Q. So during your deposition, did [plaintiff's attorney] ask you questions relative to Mrs. Kos, and one of the answers that you gave was that she asked you to manage her diabetes?
> A. Yes, and that's what I said here.
> Q. Okay. So that question and answer were asked of you at your deposition, right?
> A. Correct."

¶ 59    Next, defendants challenge plaintiff's cross-examination about the symptoms of duodenal ulcers. On direct examination, defendant listed chest pain as a possible symptom. On cross-examination, plaintiff again attempted to impeach defendant with prior inconsistent statements:

"Q. Would you be surprised if the word "chest pain" is never in your deposition or in your disclosures about what you would have expected to see in a duodenal ulcer, yes or no?

[DEFENDANTS' ATTORNEY]: Objection to form.

THE COURT: It's overruled.

A. I don't think I was asked that question.

Q. Doctor, we certainly discussed in your deposition what the signs and symptoms were of a duodenal ulcer? Yes or no?

A. Yes.

Q. And you have the deposition up there. Feel free to look in the word index, but would it surprise you if the words "chest pain" are nowhere in this deposition? Yes or no?

A. As a matter of fact, I remember it's not there."

Plaintiff then asked defendant if he understood the purpose of his disclosures and deposition:

"Q. Doctor, you understand generally that there were disclosures sent to me of what your opinions would be in this case because you told me you reviewed those, right?

A. Yes.

Q. Okay. You also understand that the purpose of me taking your deposition is to find out what your opinions in this case are going to be?

A. Yes.

Q. Okay. And you've never said the words "chest pain" being a sign and symptom of a duodenal ulcer until today, true? Yes or no?

A. True. True."

¶ 60    Other than one objection to form, defendants did not object to plaintiff's cross-examination so have forfeited any claim of error. See *People v. Collins*, 2021 IL App (1st) 180768, ¶ 31 ("Forfeiture, or failure to preserve an issue, is important because a timely objection allows the trial court to promptly correct error ***."). Even so, plaintiff's attempts to impeach defendant with prior inconsistent statements are not improper. Defendant restored his credibility on at least one occasion, minimizing any prejudice. Further, any implication that defendant intentionally left out chest pain as a potential symptom during his deposition and disclosures had minimal prejudicial impact where chest pain was not a central issue in this case. See *Boland v. Kawaski Motors Manufacturing Corp., USA*, 309 Ill. App. 3d 645, 652 (2000) ("The fact that [a witness] may have been impeached during cross-examination is not by definition 'prejudicial.' ").

¶ 61                              b. Cross-Examination of Dr. Kaufman

¶ 62    Next, defendants challenge plaintiff's questioning of Dr. Kaufman, defendants' pathology

expert. During direct examination, Dr. Kaufman reviewed Mrs. Kos's autopsy and opined that her

cancer had metastasized and spread to her liver, making it Stage 4. On cross-examination, plaintiff

elicited Dr. Kaufman's critique of Dr. Harper's failure to isolate and examine the lymph nodes in

the autopsy:

> "Q. Okay. And just to clarify your testimony, for the ladies and gentlemen of the jury, you don't disagree with any of Dr. Harper's other [autopsy] findings, except metastasis to the liver, true?
> A.  Well, I object to the fact that he didn't isolate and examine lymph nodes; in particular, a cancer case, this would—this should be done."

Before attempting to impeach Dr. Kaufman with a prior inconsistent statement, plaintiff

questioned him about Illinois Supreme Court Rule 213(f)(3), which governs disclosures by expert

witnesses:

> "Q. ***. How many trials would you say did you tell the jury you've testified in?
> A.  I would say probably about 175. I may be off, but certainly that range.
>                                   ***
> Q. Okay. And, Doctor, given how much you do this, you're very familiar with the 213(f)(3) disclosure rule?
> A. Correct.
> Q. Meaning you have to tell the other side your opinions in advance so that we are not surprised?
> A. That's correct.
> Q. Okay. You also gave a deposition in order to further tell me your opinions so that they're covered before trial?
> A. If requested, yes.
> Q. And we did that here.
> A. Correct.
> Q. Okay. And Doctor, did you—and maybe I missed it.
> I don't see anything in your 213 disclosures as to criticisms about Dr. Harper not looking at the lymph nodes. Can you—
> A.  That's correct, no, no, I didn't, but it was brought up here.
> Q. So that's a new opinion today?
> A. Yes.

***

> Q. And in fact, Doctor, when I asked you at your deposition if you disagreed with Dr. Harper about anything other than the liver, you said no, true?
> A. Correct."

¶ 63 Although defendants challenge this questioning on appeal, they did not object to it at trial so forfeited any challenge. Moreover, even plaintiff's cross-examination makes clear that Dr. Kaufman's testimony was offered for the issue of Mrs. Kos's life expectancy with cancer:

> "Q. Okay. And, Doctor, you were very clear in your prior testimony that your only disagreement with Dr. Harper was that it was not metastatic cancer, true?
> A. Correct.
> Q. And let's talk about that.
> The big difference in saying it's metastatic cancer is that she would have lower life expectancy, true?
> A. Correct.
> ***
> Q. Okay. So you're just here to say on the one finding that would change her life expectancy, you disagree, right?
> A. Correct."

Dr. Kaufman's testimony opining that Mrs. Kos's cancer had metastasized concerned her life expectancy with cancer if her fatal hemorrhage had not occurred. See *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 203 (1996) (explaining wrongful death damages are intended to compensate for untimely death, so "[t]he period of time that matters is between the date the decedent actually died and the date he or she would have been expected to die had the defendant's wrongful conduct not intervened"). Thus, Dr. Kaufman's testimony went to the issue of damages and not defendants' liability. Defendants do not mention or raise any arguments on appeal concerning damages. Thus, regardless of error, plaintiff's questions were not so prejudicial to defendants to warrant a new trial on liability.

¶ 64                          c. Cross-Examination of Dr. Posner

¶ 65    Defendants challenge plaintiff's cross-examination of Dr. Posner, defendants' surgical

oncologist expert. On direct examination, Dr. Posner testified to the five-year survival rate for

Stage 4 cancer. Additionally, he opined that if plaintiff's experts were correct and Mrs. Kos had

Stage 2B cancer, the survival rate would be "in the 30 to 40 percent range." On cross-examination,

Dr. Posner agreed that for Stage 2A and 2B, he previously "said around 50 percent." He stated,

"[a]round is not an exact number," but agreed, "I didn't give the range I gave today, yes."

¶ 66    On re-direct, Dr. Posner clarified that the survival rate for Stage 2A cancer would be 40 to

50 percent and for Stage 2B, it would be 30 to 40 percent. On re-cross examination, plaintiff again

asked about the rate for Stage 2B cancer and questioned Dr. Posner about Rule 213 disclosures:

> "Q. Doctor, you never previously disclosed an opinion that her survival rate was 30 percent for a 2B, true, before today?
> A.  I don't know what number I gave for 2B or if I gave a number.
> Q. Okay. So is it fair to say today was the first time you expressed that to your memory?
> A. If it's not in my deposition, then it would be the first time I expressed that, yes.
> Q. Well, you read your deposition before you took the stand. Did you see that you ever said 30 percent as to Stage 2B?
> A. I don't remember what I stated about 2B or if I stated about 2B specifically.
> Q. You also disclosed opinions in this case. You know that they are called 213 disclosures. Well, do you know that?
> A. I don't know what they're called. I disclosed things, but I don't know the legal term.
> Q. Okay. Then I won't use the term, but you know that you disclosed opinions in this case to counsel that would be disclosed on your behalf?
> A. Yes.
> Q. And you approved those opinions before they were filed?
> A. Yes, I did.
> Q. And I'm happy to show you those opinions if you don't have them in front of you. Do you see anything about the survival rate of Stage 2B being 30 percent.
> A. I didn't comment on Stage 2B.
> Q. So today was the first time that we got that opinion, true?
> A. That's correct."

¶ 67  On further cross-examination, plaintiff posed similar questions to Dr. Posner about his previously disclosed opinions, defendants objected, and the circuit court heard argument outside the presence of the jury. The circuit court clarified that defendants would get the final opportunity to elicit an answer about Dr. Posner's previous opinions since he is defendants' witness. Plaintiff again questioned Dr. Posner about his understanding of pretrial disclosures:

> "Q. Doctor, I'm just trying to clarify that before I ever talked to you on the other side, once you become an expert in the case, you disclose your opinions to the other side, right?
> A. Correct.
> Q. And it is—in that disclosure, it is you telling me what your opinions are going to be or telling the other side, not us asking you at that point, right?
> A. Correct.
> Q. And then you give a deposition after that, true?
> A. Correct.
> Q. And then we get more into the details of those opinions, true?
> A. Correct.
> Q. I just want to clarify that your understanding is it's not my job to try to bring new opinions out of you. It's your job to tell me your opinions and me to ask you questions about them. Do you generally understand that?
> A. Yes."

As the circuit court indicated, defendants got the final word:

> "Q. Dr. Posner, whether it's in the disclosure, in a sworn statement or here under oath as a trial witness, did you testify truthfully to every question that [plaintiff's attorney] put to you?
> A.  Yes."

¶ 68  There is no doubt that plaintiff spent ample time questioning Dr. Posner about his previous opinions and his understanding of the pretrial disclosure requirements. However, as was true with Dr. Kaufman, Dr. Posner's testimony about the survival rates of various stages of cancer was offered for the issue of Mrs. Kos's life expectancy. This was a damages issue, which defendants do not contest. Plaintiff's cross-examination of Dr. Posner, therefore, was minimally prejudicial. Thus, the circuit court did not abuse its discretion in denying defendants' motion for a mistrial

after Dr. Posner's testimony. See *Topp v. Logan*, 197 Ill. App. 3d 285, 296 (1990) ("A mistrial should be granted only when there is an occurrence of such character and magnitude as to deprive a party of a fair trial, and the moving party demonstrates actual prejudice as a result.").

¶ 69                                    4. *Photographs*

¶ 70    Defendants argue that the circuit court abused its discretion in allowing plaintiff to show the jury photographs of Mrs. Kos's apartment from the day of her death depicting trails of blood. Defendants argue the photographs should have been excluded under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) because the graphic nature of the photographs posed a considerable risk of undue prejudice and had limited probative value. Plaintiff argues that the photos depicted both Mrs. Kos's and plaintiff's damages where they showed the scene in which plaintiff found his mother before her death. Plaintiff further argues that the risk of prejudice was reduced where the circuit court did not allow duplicative photos of the same scene, the photos were only shown once, and the testimony accompanying each photo was short. "A trial court's decision to admit relevant evidence, including photographs, will not be disturbed absent an abuse of discretion." *Taylor*, 2024 IL App (1st) 221232, ¶ 93.

¶ 71    Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403. Relevant photographic evidence is generally admissible but may be excluded under the Rule 403 balancing test. *Peach v. McGovern*, 2019 IL 123156, ¶ 27. However, a photo with sufficient probative value "may be admitted in spite of the fact that the photograph may be gruesome and inflammatory." (Internal quotation marks omitted.) *People v. Scott*, 148 Ill. 2d 479, 546 (1992). As such, it is not an abuse of discretion to admit "gruesome" photographs when they are probative of a decedent's

pain and suffering. *Drews v. Gobel Freight Lines, Inc.*, 144 Ill. 2d 84, 99-101 (1991); *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 417-18 (2005); see *Murphy v. Martin Oil Co.*, 56 Ill. 2d 423, 431-32 (1974) (holding damages are recoverable for pain and suffering before a decedent succumbs to their injuries); see also *Hall v. National Freight, Inc.*, 264 Ill. App. 3d 412, 427-28 (1994) ("[D]amages for conscious pain and suffering may be sustained where the decedent was shown to have been conscious prior to death ***.").

¶ 72    The photographs at issue here were taken by a neighbor shortly after plaintiff discovered Mrs. Kos in her home and they went to the hospital. The photographs reflect the state of the apartment when plaintiff discovered Mrs. Kos and show the aftermath of Mrs. Kos's bleeding before she died. Defendants filed a motion *in limine* seeking to exclude the 16 photographs of Mrs. Kos's apartment. The circuit court ruled on each photograph individually and admitted 10, excluding ones that were duplicative of the same area of the apartment. The photos show blood inside Mrs. Kos's apartment on the hallway and kitchen floors, in a garbage can, on a chair, in the bedroom, on the bed, and in and on the toilet. The photos mostly show dried trails and small puddles of blood and are not overly graphic. The most graphic photo, containing the most amount of blood, is the photo of the toilet. The circuit court allowed only one photo of the toilet, excluding the other two taken from different angles to minimize prejudice.

¶ 73    Plaintiff testified that he was on the phone with his mother while she was inside her apartment, struggling to open the door for him. He knew she had been vomiting blood for at least 90 minutes. Once plaintiff broke into the apartment, he found Mrs. Kos unresponsive on the toilet but was able to revive her before the ambulance came. The photographs, therefore, show the pain and suffering Mrs. Kos went through in her apartment before being transported to the hospital and

ultimately dying, so have sufficient probative value on damages. Additionally, the scene that plaintiff discovered has probative value as to his own mental suffering, also affecting damages. See *Binkowski v. International Health Systems, Inc.*, 2024 IL App (1st) 221557, ¶ 103 (explaining the next of kin's grief, sorrow, and mental suffering are recoverable under the Wrongful Death Act); 740 ILCS 180/2(a) (West 2024). Given the probative value of the photos and the circuit court's efforts to minimize unnecessary prejudice, it was not an abuse of discretion for the circuit court to admit the photos.

¶ 74    Defendants argue that the risk of undue prejudice was high where the photographs were akin to a crime scene. But crime scene photographs too are admissible where the probative value outweighs any unfair prejudice. See, *e.g.*, *People v. Maldonado*, 402 Ill. App. 3d 411, 420-21 (2010) (concluding the circuit court did not abuse its discretion in admitting crime scene photographs that were gruesome but probative and aided in depicting the events at issue). The photos here were not so graphic or gruesome to outweigh their probative value.

¶ 75    Defendants also argue that the jury should not have been shown the photos where the scene and injuries were adequately described in plaintiff's testimony, citing *Pyskaty*, 266 Ill. App. 3d at 822. In that case, however, the appellate court upheld the circuit court's decision to exclude the photographs. *Id.* at 822-23 The court explained that some of the photos had no probative value as to the plaintiff's injuries where they were taken during surgery and were "representative neither of plaintiff's condition when he saw [the doctor] nor of his condition after surgery." *Id.* at 822. Moreover, in that case, "[p]laintiff and several medical witnesses gave extensive testimony about the nature and scope of plaintiff's claimed injuries," and "[p]laintiff graphically described his condition." *Id.* The same is not true here. Moreover, when it comes to pain and suffering, "[i]t is

an old cliche that a picture is worth a thousand words. Much that sounds cold coming from a witness may be better conveyed by a photograph." *Parson v. City of Chicago*, 117 Ill. App. 3d 383, 390 (1983).

¶ 76                                      5. *Cumulative Error*

¶ 77    Lastly, defendants argue that the cumulative prejudicial effect of the trial errors warrant a new trial. "A new trial is necessary when the cumulative effect of trial errors so deprives a party of a fair trial that the verdict might have been affected." *In re Estate of Mankowksi*, 2014 IL App (2d) 140154, ¶ 63. "Generally, minor improprieties during a lengthy, complex and difficult trial do not warrant reversal where the trial as a whole was fair." (Internal quotation marks omitted.) *Snowstar Corporation v. A&A Air Conditioning & Refrigeration Service, Inc.*, 2024 IL App (4th) 230757, ¶ 58.

¶ 78    The circuit court is in the best position to assess the prejudice attached to any putative trial error in connection with a motion for a new trial. See *Maple*, 151 Ill. 2d at 456 ("[I]t is important to keep in mind that the presiding judge in passing upon the motion for new trial has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." (Internal quotation marks omitted.)). Here, the circuit court denied defendants' motion in part because it concluded that defendants were not substantially prejudiced. Based on our review of defendants' contentions of error, both individually and cumulatively, we cannot conclude the circuit court abused its discretion in denying defendants a new trial. See *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005) ("If the alleged errors do not amount to reversible error on any individual issue, generally there is no cumulative error.").

¶ 79                                  III. CONCLUSION

¶ 80    The judgment of the circuit court of Cook County is affirmed.

¶ 81    Affirmed.

***Kos v. Muzykansky, M.D.*, 2026 IL App (1st) 242359**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2020 L 013279; the Hon. Daniel A. Trevino, Judge, presiding. |
| **Attorneys for Appellants:** | David C. Burtker and Krista R. Frick, of Cunningham Meyer & Vedrine, P.C., and Scott L. Howie, Laura Coffey Ieremia, and Alexandra M. Frisch, of Donohue Brown Smyth LLC, for appellants. |
| **Attorneys for Appellee:** | Leslie J. Rosen, of Leslie J. Rosen Attorney at Law, P.C., and Stephanie K. Nathanson, of Law Offices of Stephanie K. Nathanson, for appellee. |